Rafael Icaza (Idaho Bar No. 10912)
Rebecca Evans (Pro Hac Vice *to be submitted*)
**LawHQ, LLC**
299 S. Main St. #1300
Salt Lake City, UT 84111
Phone: (385) 233-6612 ext. 3152
rafaelicaza@lawhq.com
rebecca@lawhq.com

*Attorneys for Plaintiffs, listed on Exhibit A and the signature page*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **Nathan Chennette**, et al, <br><br> Plaintiffs, <br><br> v. <br><br> **Porch.com Inc.,** a Delaware corporation; **GoSmith Inc.** a Delaware corporation; **Matthew Ehrlichman**, CEO and co-founder of Porch.com Inc. and CEO of GoSmith, Inc., in his individual capacity; **Brenton Marrelli**, CEO and co-founder of GoSmith Inc., in his individual capacity; and **Darwin Widjaja,** CTO and co-founder of GoSmith Inc. and VP of Porch.com Inc., in his individual capacity, <br><br> Defendants | Civil Case No.: <br><br><br> **COMPLAINT** <br><br><br><br><br> **JURY TRIAL DEMANDED** |

**Introduction**

Nathan Chennette and 50 other individuals ("Plaintiffs") bring this action seeking to enforce Plaintiffs' rights to privacy under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. The TCPA is a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. See *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012).

COMPLAINT - 1

GoSmith Inc, Porch.com Inc, Matthew Ehrlichman, Darwin Widjaja, and Brenton Marrelli ("Defendants") have blatantly violated the TCPA by using an automatic telephone dialing system, or "ATDS", to send telemarketing text messages to Plaintiffs' cellular telephone numbers for the purposes of selling leads to home improvement contractors. Further violating the TCPA, Defendants sent text messages to Plaintiffs despite Plaintiffs' presence on the National Do Not Call Registry.

Plaintiffs have standing under the TCPA to bring this action before the Court, which Plaintiffs now do, and respectfully request relief.

## I.      Parties

1.      There are 51 Plaintiffs in this lawsuit, each of whom is a "person" as defined by 47 U.S.C. § 153 (39). For the name, county, and state of each Plaintiff, see Exhibit A.

2.      Defendant Porch.com ("Porch.com") is a Delaware corporation with its principal place of business at 2201 1st Ave. S. Seattle, WA 98134.

3.       Defendant GoSmith, Inc. ("GoSmith") is a Delaware corporation with its principal place of business at 1250 Borregas Ave, Sunnyvale, CA 94089.

4.      Defendant Matthew Ehrlichman ("Ehrlichman") is a "person" as defined by 47 U.S.C. § 153 (39) and is a resident of King County, Washington.

5.      Defendant Brenton Marrelli ("Marrelli") is a "person" as defined by 47 U.S.C. § 153 (39) and is a resident of San Mateo County, California.

6.      Defendant Darwin Widjaja ("Widjaja") is a "person" as defined by 47 U.S.C. § 153 (39) and is a resident of Alameda County, California.

## II.      Jurisdiction and Venue

7.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, as the action arises under the TCPA, which is a federal statute.

8.      This Court has personal jurisdiction over all Defendants because they all were involved in conducting a significant amount of business in this District, soliciting businesses in this District, and sending unsolicited text messages to this District.

COMPLAINT - 2

9.      Venue is proper in this District under 28 U.S.C. § 1391(b) because all Defendants were involved in conducting a significant amount of business within this District and all engaged in significant telemarketing to this District.

### III.      Statement of Facts Common to All Claims

10.     GoSmith has sent 7,527 text messages to Plaintiffs using an Automatic Telephone Dialing System. *See* Exhibit A.

11.     Of these messages, GoSmith has sent 2,754 text messages to Plaintiffs' phone numbers that are registered on the National Do Not Call Registry. *See* Exhibit A. These are residential phone numbers which Plaintiffs use in their home-based-businesses.

12.     Plaintiffs have received more than one text message from GoSmith within a 12-month period.

13.     The business model of GoSmith and Porch.com is to sell leads to home improvement contractors. The leads that GoSmith and Porch.com sell are of people looking for help with services such as painting, landscaping, plumbing, etc.

14.     Starting around August 2012 until 2019, GoSmith developed and engaged in massive programmatic web scraping, scraping the websites of Yelp.com, YellowPages.com, BBB.org, and other similar web pages. In doing so, GoSmith obtained the information of over ten million contractors nationwide.

15.     Each time GoSmith scraped a new contractor, GoSmith stored the information of the contractor in GoSmith's own database. The information GoSmith stored for each contractor included the contractor's company name, city, state, zip code, phone number, the category of services the contractor provides, the exact URL where GoSmith scraped the information, the date the information was first scraped, and more. *See* Exhibit B.

16.     When storing the information, GoSmith generated a unique ProviderID for each contractor. The ProviderID increased sequentially for each new contractor that GoSmith stored in its database (e.g. 11401, 11402, 11403, 11404, etc). Thus, GoSmith used a sequential number generator to *store* each phone number and associated information for each contractor.

COMPLAINT - 3

17.     GoSmith then sent automated text messages to contractors who had a mobile phone number.

18.     Reverse phone number lookups on the text messages show that GoSmith used Sprint Business, Bandwidth, and other similar telephone providers to send the text messages.

19.     Sprint Business and Bandwidth allow users to send text messages via an API so that text messages can be sent programmatically and automatically. In fact, with Bandwidth, the only way to send text messages is using their API and cloud infrastructure.

20.     The messages GoSmith sent to Plaintiffs typically say: "[Name] is wanting [service] in [city]. You have 1st priority. Reply 1 if interested, 3 if not."

21.     Here is an example of some of the text messages that GoSmith sent to Plaintiff Nathan Chennette:



COMPLAINT - 4

22.    The manner in which GoSmith wrote and responded to the messages show that an automated system—and not a human—sent and responded to the messages.

23.    A human who manually sends and responds to a text message conversation does not tell someone "Reply 1 if interested, 3 if not." Rather, these numbers are codes for an automated system to receive a response, interpret the message, and automatically respond.

24.    Here are some examples of text messages from GoSmith showing that when contractors respond with a number, GoSmith sent an automated response. But when contractors respond with a question or try to have a conversation, nobody responds:









COMPLAINT - 5

25.     Additionally, here is another example of a contractor who received five of the exact same text messages from GoSmith, all from different phone numbers, within a 7 minute time span. This clearly is an automated system gone awry:



26.     All of this indicates that GoSmith (i) stored phone numbers to be dialed in GoSmith's database, (ii) coded their system to integrate with telephone providers such as Bandwidth and others that allow for programmatic and automatic text messaging, and (iii) then sent automated text messages at scale to the stored numbers. Thus, GoSmith knowingly and willfully sent the text messages using an automatic telephone dialing system.

27.     At no time did Plaintiffs provide their phone number or information to GoSmith or any of the other Defendants. Plaintiffs never consented, in any form, to receive automated text messages from GoSmith or any of the other Defendants.

28.     Because GoSmith obtained Plaintiffs' information by scraping third party websites, it is impossible that GoSmith or the other Defendants can say they relied on Plaintiffs' websites or other marketing materials to construe that Plaintiffs somehow gave GoSmith or the other Defendants consent to be messaged.

29.     The links included in the messages directed contractors to gosmith.com.

COMPLAINT - 6

30.     Many text messages contained URLS such as  www.smithjobs-2.com. These were custom URLs that redirected to gosmith.com when clicked, and allowed GoSmith to track the behavior and activity of the contractors GoSmith was text messaging.

31.     The WHOIS domain information for smithjobs-2.com shows the registrant name as Darwin Widjaja and registrant email as darwin@gosmith.com. This shows Widjaja was involved in the technological set up and administration of these telemarketing campaigns.

32.     The domain gosmith.com is owned and controlled by GoSmith and was GoSmith's website until GoSmith shut it down January 31, 2020. All of this indicates that the text messages were sent by GoSmith.

33.     When a contractor clicked any of the URLs to view a lead, the contractor was required to purchase credits to receive the lead information.

34.     Also, if contractors asked GoSmith for more information by texting "2", GoSmith sent this message: "Our system runs on appointment credits, 1 credit is $8. We guarantee a connection with the homeowner or we'll refund your credits. Reply 1 to get started."

35.     This indicates that GoSmith was selling leads, not merely giving them away. The text messages were thus business solicitations and constitute telemarketing.

36.     None of the text messages asked Plaintiffs if they wanted to come work for Defendants or offered Plaintiffs employment at GoSmith or Porch.com, and thus were not messages regarding employment or job opportunities.

37.     Marrelli is the co-founder of GoSmith and personally created, set up, ran, and oversaw GoSmith's marketing from its inception. In a declaration filed in August 2017 Marrelli stated: "I am the Chief Executive Officer ('CEO') of GoSmith, Inc. ('GoSmith'), and I have held this position since January 2017.  In my role as CEO of GoSmith, *I am involved in nearly every facet of GoSmith's operations* and have comprehensive personal knowledge of GoSmith's business model and internet operations." Declaration of Brenton Marrelli in Support of Defendant GoSmith, Inc.'s Motion to Compel Arbitration in *Rojas v. GoSmith, Inc.*, (N.D. Ind. 2017), 17-cv-00281, Dkt. 16-2, ¶ 2 (emphasis added) (attached hereto as Exhibit  C).

COMPLAINT - 7

38.     Widjaja, is the co-founder of GoSmith, and personally created, set up, ran, and oversaw GoSmith's marketing from its inception. In a declaration filed October 2017 Widjaja stated: "I am the Chief Technology Office ('CTO') of GoSmith, Inc. ('GoSmith), and I have held this position since January 2017. In my role as CTO of GoSmith, *I am involved in nearly every facet of GoSmith's operations* and have comprehensive personal knowledge of GoSmith's business model and internet operations." Declaration of Darwin Widjaja in Support of Defendant GoSmith, Inc.'s Motion to Compel Arbitration in *La Force v. GoSmith, Inc.*, (N.D. Cal. 2017), 4:17-CV-05101, Dkt. 16-1, ¶ 2 (emphasis added) (attached hereto as Exhibit  D).

39.     On LinkedIn, Marrelli lists himself as the CEO of GoSmith (2012 - Present), and Widjaja lists himself as the CTO of GoSmith (2012 - Present). See https://www.linkedin.com/in/brentonmarrelli/ and https://www.linkedin.com/in/darwinwidjaja/, last accessed on January 30, 2020 2:25 p.m. MST.

40.     Widjaja shares on his LinkedIn profile that: "My co-founder [Marrelli] and I bootstrapped the company and in 5 years, we were able to grow the service to cover nationwide and reaching [sic] $10M in annual revenue. Prior to an acquisition by Porch.com in January 2017, I was building and managing a team of engineers, designer [sic] and customer success managers." See https://www.linkedin.com/in/darwinwidjaja/, last accessed on January 30, 2020 2:25 p.m. MST.

41.     Marrelli and Widjaja, as the co-founders and CEO/CTO of GoSmith, have been directly involved in the strategy, approval, set up, and execution of the telemarketing campaigns referenced in this complaint which have violated the TCPA.

42.     After Porch.com acquired GoSmith in January 2017, GoSmith became a wholly-owned subsidiary of Porch.com.

43.     GoSmith's foreign business filing in Washington shows Ehrlichman and Marrelli are GoSmith's Governors. GoSmith's foreign business filing in California shows Ehrlichman is GoSmith's CEO.

COMPLAINT - 8

44.     As the CEO and Governor of GoSmith, Ehrlichman has also been directly involved in the strategy and continued approval of the telemarketing campaigns referenced in this complaint which have violated the TCPA.

45.     Marrelli, Widjaja, and Ehrlichman have been actual participants in these TCPA torts because they have personally authorized, overseen, and directed the illegal telemarketing. Each of them is therefore personally liable as tort participants.

46.     In the past three years, GoSmith has been sued 10 times for TCPA violations. In each lawsuit, Marrelli, Widjaja, and Ehrlichman have been given actual and constructive notice that GoSmith's telemarketing was problematic and illegal, yet they defended and continued to authorize GoSmith's telemarketing. Thus each of them has explicitly and implicitly authorized and engaged in the illegal telemarketing and they are each personally liable as tort participants.

47.     In addition to Marrelli, Widjaja, and Ehrlichman being personally liable as tort participants, Porch.com has also participated in the illegal marketing and is therefore liable.

48.     Porch.com has intentionally used the corporate form to prevent Porch.com from being liable for illegal telemarketing. Treating Porch.com and GoSmith as a single corporation is necessary to avoid the injustice which would result from treating them as distinct entities.

49.     GoSmith is the alter ego of Porch.com and therefore Porch.com is liable for GoSmith's illegal text messages.

50.     Such a unity of ownership and interest exists between GoSmith and Porch.com that the separate corporations of GoSmith and Porch.com no longer existed before GoSmith was dissolved in January 2020.  This is evidenced by the following facts:

    A.   GoSmith is inadequately capitalized. GoSmith intentionally and wilfully exposed itself to hundreds of millions of dollars in TCPA violations with no sufficient means to pay for these liabilities. GoSmith closed its doors at the end of January 2020, and now has few to no assets.

    B.   GoSmith and Porch.com have commingled their assets. Here are six examples of their commingling:

COMPLAINT - 9

i.    First, at https://forum.nachi.org/t/porch-gosmith/120546, a user named Vince Del Fine reported in December 2017: "I received a lead from both [Porch.com and GoSmith] and it's the same client. Not the first time either." To this, another user named Frank Rotte responded, "I believe they are one in [sic] the same. I signed up with Porch as a client looking for a home inspection, and received a text from Smith, as the inspector, asking if I was interested in the job." *Id.*

ii.   Second, GoSmith's website showed detailed information regarding the leads GoSmith was texting to contractors, including the source of each lead. Virtually all of the leads since January 2017—when Porch.com acquired GoSmith—show the source of the leads as: "PorchSharedLeads." In other words, in an effort to find contractors for Porch.com's leads, Porch.com used GoSmith to send text messages to contractors nationwide. *See* Exhibit E.

iii.  Third, at the end of January 2020 when GoSmith was winding down, GoSmith sent text messages to contractors informing the contractors that their info would be automatically migrated to Porch.com:



iv.   Fourth, if a contractor clicked the URLs in any of GoSmith's text messages during the last week of January 2020, the contractor was automatically logged

COMPLAINT - 10

into an online dashboard on GoSmith.com, and saw this message:



v.   Fifth, the data that loaded behind the scenes when accessing the contractor

dashboard showed that GoSmith saved multiple fields of data for each

contractor, including these two fields: The first was called

"PorchMigrationState," which indicated whether GoSmith had migrated the

contractor to Porch.com. The second was called "PorchCompanyID," which

referenced the company id that Porch.com used for that contractor. *See*

Exhibit B.

vi.   Sixth, many of the text messages GoSmith sent came from numbers such as

650-250-7911 and 650-250-7913. CNAM is an authoritative database that the

phone companies use to identify the entity or person behind a telephone

number. A CNAM lookup on these numbers returns the name "Porchcom

Inc." In other words, GoSmith and Porch.com shared the same phone numbers

to send text messages to contractors and/or GoSmith has merged its phone

numbers and infrastructure into Porch.com.

C.   GoSmith has been the mere instrumentality of Porch.com for a single venture. This

is readily seen in the examples above regarding commingling of assets. Porch.com

used GoSmith to expand its contractor network, and GoSmith funneled all of their

COMPLAINT - 11

contractors to Porch.com. The purpose of this single venture is to build a single, massive network of contractors nationwide for Porch.com.

D.    Porch.com has used GoSmith as a subterfuge for illegal transactions. The text messages GoSmith sent violate the TCPA. After 10 TCPA class actions have been brought against GoSmith in the last three years, Porch.com clearly had actual and/or constructive knowledge that GoSmith's telemarketing was illegal. But Porch.com continued to intentionally abuse the corporate form and spam contractors through GoSmith because doing so allowed Porch.com to escape the legal consequences of their actions and evade the legal duty not to violate the TCPA. These acts were taken by GoSmith in the interest of Porch.com rather than GoSmith's own interest.

E.    Porch.com and GoSmith have identical officers. On LinkedIn, Widjaja not only lists himself as the CTO of GoSmith, but also as a VP of Porch.com. Additionally, Erhlichman is the CEO Porch.com and the CEO of GoSmith.

F.    Both Porch.com and GoSmith employ attorneys from Manatt, Phelps & Phillips, LLP.

51.    Porch.com has had actual and/or constructive knowledge of GoSmith's blatant TCPA violations. Porch.com has allowed GoSmith to continue to spam because of the benefit to Porch.com's own contractor network. Porch's conduct has clearly been in bad faith. To allow Porch.com to hide behind GoSmith's corporate veil would be unfair, unjust, inequitable, and would prevent Plaintiffs from obtaining any meaningful remedy because GoSmith has shut down, has transferred its assets to Porch.com, and now has few to no assets

52.    In addition to alter ego liability, Porch.com is also vicariously liable for text messages that GoSmith sent seeking contractors for Porch.com's leads. In sending these text messages, GoSmith was the agent of Porch.com via actual authority and ratification.

53.    Porch.com acquired GoSmith in 2017 and then integrated their two systems such that Porch.com would send its leads to GoSmith, and have GoSmith send out text messages

COMPLAINT - 12

seeking to find contractors for these leads. Clearly GoSmith reasonably believed that Porch.com wanted GoSmith to send text messages for each of these new leads, otherwise Porch.com wouldn't have sent GoSmith its leads and integrated their two systems. Thus GoSmith had actual authority to act on behalf of Porch.com.

54.    Even in the virtually impossible event there weren't actual authority, there was also ratification because GoSmith was sued 10 times in the past 3 years while Ehrlichman was the CEO of GoSmith and Porch.com, and while Widjaja was the CTO of GoSmith VP of Porch.com. This is an externally observable indication that Porch.com had actual knowledge of material facts regarding GoSmith's telemarketing, and Porch.com chose to accept the benefits of GoSmith's acts by continuing to send leads to GoSmith for GoSmith to then send text messages seeking contractors for these leads.

55.    In the unlikely event Porch.com was aware of the GoSmith lawsuits but chose to be unaware of the material facts regarding GoSmith's telemarketing, Porch.com was willfully ignorant of GoSmith's telemarketing, and thus ratified GoSmith's telemarketing.

56.    By sending hundreds of text messages to Plaintiffs, Defendants harmed Plaintiffs in the exact way that Congress sought to prevent by enacting the TCPA.

57.    Plaintiffs have suffered lost time, an annoyance, a nuisance, and an invasion of privacy because of the text messages.

### IV.    Legal Standard

#### i.    The National Do Not Call Registry

58.    Congress, via the TCPA, authorized a rulemaking proceeding to explore how to best "protect residential telephone subscribers' privacy rights." 47 U.S.C. § 227(c)(1).

59.    The end result of the rulemaking proceeding was the creation of the National Do Not Call Registry ("Registry"). The Registry is a single national database of telephone numbers where residential telephone subscribers can object to receiving telephone solicitations. Telephone solicitations to numbers on the Registry are prohibited. 47 C.F.R. §64.1200(c)(2).

COMPLAINT - 13

*ii.    Prohibitions on Automated Telemarketing Calls*

60.     In 1991, Congress passed the TCPA to regulate the explosive growth of the telemarketing industry.  In doing so, Congress recognized that "[u]nrestricted telemarketing… can be an intrusive invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

61.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service."  *See* 47 U.S.C. § 227(b)(1)(A)(iii).

62.     The TCPA defines an "automatic telephone dialing system" ("ATDS") as "equipment that has the capacity - (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

63.     Courts have explained that the statutory definition of an ATDS means "equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers." *See Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. Sep. 20, 2018).

64.     In 2012, the FCC issued an order tightening the restrictions for automated telemarketing calls, requiring "prior express **written** consent" for such calls to wireless numbers. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1838 [8] ¶¶18, 20 (February 15, 2012) (emphasis supplied).

65.     To obtain express written consent for telemarketing calls, a defendant must establish that it secured the plaintiff's signature in a form that gives the plaintiff a "'clear and conspicuous disclosure' of the consequences of providing the requested consent. . . . [and] having received this information, agrees unambiguously to receive such calls at a telephone number the [plaintiff] designates." *Id* at 1843 [13] ¶32 (citing the FTC's rules for telemarketing calls, codified at 16 C.F.R. § 310.4(b)(v)(A)(i), (iii), (iv).

COMPLAINT - 14

66.     The TCPA regulations promulgated by the FCC define "telemarketing" as  the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(12).

67.     In determining whether a communication constitutes telemarketing, a court must evaluate the ultimate purpose of the communication. See *Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015).

68.     "Neither the TCPA nor its implementing regulations 'require an explicit mention of a good, product, or service' where the implication of an improper purpose is 'clear from the context.'" *Id.* (citing *Chesbro v. Best Buy Stores*, L.P., 705 F.3d 913, 918 (9th Cir. 2012)).

69.     The FCC has explained that calls motivated in part by the intent to sell property, goods, or services are considered telemarketing under the TCPA. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶¶ 139-142 (2003). This is true whether call recipients are encouraged to purchase, rent, or invest in property, goods, or services during the call or in the future. *Id.*

70.     If a call is not deemed telemarketing, a defendant must nevertheless demonstrate that it obtained the plaintiff's prior express consent. *See In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7991-92 (July 10, 2015) (requiring express consent "for non-telemarketing and non-advertising calls").

71.     The FCC has issued rulings and clarified that consumers are entitled to the same consent-based protections for text messages as they are for calls to wireless numbers. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009).

###     *iii.   Individual Officer Liability*

72.     Under the TCPA, an individual may be personally liable pursuant to 47 U.S.C. § 217, which provides that the "act, omission, or failure… of any officer… acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure… of such carrier or user as well as of that person." 47. U.S.C. § 217.

COMPLAINT - 15

73.     To violate the TCPA is to commit a tort, and a "corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort." *Donsco, Inc. v. Casper Corp.*, 587 F. 2d 602 (3d Cir. 1978).

74.     When considering individual officer liability, Courts have agreed that a corporate officer involved in the telemarketing may be personally liable under the TCPA. *See, e.g., City Select Auto Sales Inc. v. David Randall Assocs., Inc.*, 885 F.3d 154, (3d Cir. 2018) ("[A] corporate officer can face personal liability under the TCPA for actions he personally authorized or took.")(J. Schwartz, concurring in the majority opinion, which reads: "a corporate officer can be personally liable [under the TCPA] if he . . . actively oversaw and directed the conduct."); *Jackson Five Star Catering, Inc. v. Beason*, 2013 U.S. Dist. LEXIS 159985, *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA "where they 'had direct, personal participation in or personally authorized the conduct found to have violated the statute.'"); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

### iv.   *Equitable Alter Ego Liability*

75.     Under Idaho's equitable alter ego doctrine, a subsidiary is the alter ego of its parent corporation—and the parent corporation is therefore liable for the subsidiary's acts—when the following two conditions are met: (1) There exists "a unity of interest and ownership  to a degree that the separate personalities of the [parent corporation] and [subsidiary] no longer exist" and (2) that "if the acts are treated as acts of the [subsidiary] an inequitable result would follow." *Lunneborg v. My Fun Life*, 421 P.3d 187, 199 (Idaho 2018); *see also Ross v. Coleman Co.*, 761 P.2d 1169, 1183 (Idaho 1988) (discussing alter ego liability in context of a parent corporation and subsidiary relationship).

76.     Whether "a corporate entity may be disregarded [will] vary according to the circumstances of the case." *Hutchison v. Anderson*, 950 P.2d 1275, 1279 (Idaho App. 1997).

COMPLAINT - 16

Factors for court consideration include but are not limited to: Whether corporate officers were shared, "the level of control that the shareholder exercises over the corporation, the lack of corporate formalities, the failure to operate corporations separately, keeping separate books, and the decision-making process." *Wandering Trails, LLC v. Big Bite Excavation, Inc.*, 329 P.3d 368, 376 (Idaho 2014).

> ### *v.    Vicarious Liability*

77.     For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the TCPA,* 10 FCC Rcd 12391, 12397 (¶ 13) (August 7, 1995).

78.     In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 23 FCC Rcd. 559, 564 (January 4, 2008)*.*

79.     In 2013, the FCC instructed that Defendants may not avoid liability by outsourcing their telemarketing to third parties. *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd 6574, 6588 ¶37 (2013).

80.     The FCC stated that corporations are "vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574. This includes principles of formal agency, apparent authority, and ratification. *Id.* at 6584.

81.     Federal common law agency principles are based off of the Restatement (Third) of Agency. *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1072-73 (9th Cir. 2019).

82.     An agent has actual authority when "the agent reasonably believes... that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01 (2006).

83.     An agent has apparent authority when "a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency § 2.03 (2006).

COMPLAINT - 17

84.     If there is no agency relationship, ratification can create one. Ratification can

happen in one of two ways: (i) When there is an "externally observable indication" that a

principal has "[actual] knowledge of material facts" regarding a third party's acts, and accepts

the benefits of—and consents to—said acts; or (ii) When a principal is "willful[ly] ignoran[t]"

of the material facts of a third party's acts. *Henderson v. United Student Aid Funds, Inc.*, 918

F.3d 1068, 1073-74 (9th Cir. 2019).

### *vi.  Standing Under the TCPA*

85.     Any residential telephone subscriber on the Registry who has received more than

one telephone solicitation "within any 12-month period by or on behalf of the same entity" may

bring an action for damages. 47 U.S.C. § 227(c)(5).

86.     The TCPA also provides a private right of action for persons who receive

automated, artificial, or prerecorded calls in violation of 47 U.S.C. § 227(b)(1)(A).  *See* 47

U.S.C. § 227(b)(3).

87.     In an action under 227(b), a plaintiff must only show that the defendant "called a

number assigned to a cellular telephone service using an automatic dialing system or prerecorded

voice." *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012), aff'd,

755 F.3d 1265 (11th Cir. 2014).

88.     A plaintiff alleging a violation under the TCPA "need not allege any additional

harm beyond the one Congress has identified." *Van Patten v. Vertical Fitness Grp., LLC*, 847

F.3d 1037 (9th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016)).

89.     The receipt of a telemarketing or unsolicited call "demonstrates more than a bare

violation and satisfies the concrete-injury requirement for standing." *Leyse v. Lifetime Entm't*

*Servs., LLC*, Nos. 16-1133-cv, 16-1425-cv, 2017 U.S. App. LEXIS 2607 (2d Cir. 2017) (citing *In*

*re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 105 (2d Cir. 2013)

("The injury-in-fact necessary for standing need not be large; an identifiable trifle will suffice.");

*Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 819-21 (8th Cir. 2015) (holding that receipt of two

COMPLAINT - 18

brief unsolicited robocalls as voicemail messages was sufficient to establish standing under TCPA).

90.     Congress made clear that the TCPA was meant to protect both consumers and businesses. Congress enumerated 15 findings when passing the TCPA, four of which explicitly reference businesses and Congress's intent to protect them:

> A.   "The use of the telephone to market goods and services to the home ***and other businesses*** is now pervasive due to the increased use of cost-effective telemarketing techniques." Congressional Statement of Findings, § 2, Pub.L. 102-243.(emphasis added).
>
> B.   "Over 30,000 businesses actively telemarket goods and services ***to business*** and residential customers." *Id*. (emphasis added).
>
> C.   "***Businesses also have complained*** to the Congress and the Federal Communications Commission that automated or prerecorded telephone calls are a nuisance, are an invasion of privacy, and interfere with interstate commerce. *Id*. (emphasis added).
>
> D.   The Federal Communications Commission should consider adopting reasonable restrictions on automated or prerecorded calls ***to businesses*** as well as to the home, consistent with the constitutional protections of free speech. *Id*. (emphasis added)

91.     The FCC has stated that residential telephone subscribers who also use their phone number for business purposes are not precluded from adding their number on the Registry. Indeed, the FCC has "decline[d] to exempt from the do-not-call rules those calls made to 'home-based businesses.'" *Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 20 FCC Rcd. 3788, 3793 (2005).

COMPLAINT - 19

## V.      First Cause of Action:

### Illegal Use of an ATDs

92.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

93.     The Defendants' use of an ATDS to contact Plaintiffs constitutes a violation of 47 U.S.C. § 227(b).

94.     As a result of Defendants' negligent violations of 47 U.S.C. § 227(b), Plaintiffs are entitled to an award of $500.00 in statutory damages, for each and every violation,  pursuant to 47 U.S.C. § 227(b)(3)(B).

95.     As a result of Defendants' knowing and/or willful violations of 47 U.S.C. § 227(b), Plaintiffs are entitled to an award of $1,500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

96.     Plaintiffs are also entitled to and seek injunctive relief prohibiting such conduct in the future.

## VI. Second Cause of Action:

### Illegal Solicitation of Persons on the National Do Not Call Registry

97.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

98.     Defendants' contact of Plaintiffs' cellular phone numbers on the National Do Not Call Registry constitutes a violation of 47 U.S.C. § 227(c) and 47 C.F.R. §64.1200(c).

99.     As a result of Defendants' negligent violations of 47 U.S.C. § 227(c), Plaintiffs are entitled to an award of $500.00 in statutory damages for each and every violation,  pursuant to 47 U.S.C. § 227(c)(5)(B).

100.     As a result of Defendants' knowing and/or willful violations of 47 U.S.C. § 227(c), Plaintiffs are entitled to an award of $1,500.00 in statutory damages for each and every violation, pursuant to 47 U.S.C. § 227(c)(5)(B) and 47 U.S.C. § 227(c)(5)(C).

101.    "Congress evidenced its intent that a person be able to recover for the telemarketer's failure to institute the minimum procedures for maintaining a do-not-call list as well as the additional harm of the call being automated." Thus, "a person may recover statutory damages of $1500 for a willful or knowing violation of the automated-call requirements, § 227(b)(3), and $1500 for a willful or knowing violation of the do-not-call-list requirements, § 227(c)(5)—even if both violations occurred in the same telephone call." *Charvat v. NMP, LLC*, 656 F.3d 440, 448-9 (6th Cir. 2011).

102.    Plaintiffs are also entitled to and seek injunctive relief prohibiting such conduct in the future.

## VII. Relief Requested

103.    WHEREFORE, Plaintiffs respectfully request the Court grant Plaintiffs the following relief against Defendants:

104.    Plaintiffs seek an amount not less than $11,290,500 as a result of Defendants' violations of 47 U.S.C. § 227(b).

105.    Plaintiffs seek an amount not less than $4,131,000 as a result of Defendants' violations of 47 U.S.C. § 227(c).

106.    Plaintiffs seek costs pursuant to 28 U.S.C. § 1920.

107.    Plaintiffs seek judgment interest pursuant to 28 U.S.C. § 1961.

108.    Plaintiffs seek injunctive relief prohibiting such conduct in the future.

109.    Plaintiffs seek any other relief the Court may deem just and proper.

## VIII.  Jury Demand

110.    Plaintiffs request a trial by jury of all claims that can be so tried.


Date: 4/21/2020                    Respectfully submitted,


                                   /s/ Rafael Icaza

COMPLAINT - 21

Rafael Icaza

/s/ *Rebecca Evans*
Rebecca Evans

Attorneys for Plaintiffs listed below


## LIST OF PLAINTIFFS

| | |
|---|---|
| Larry Akins | Steven Dick |
| Gary Alger | Greg Dodgson |
| Gabriel Anguiano | Briana Ethington |
| Joshua Barkdull | Jonathon Forsythe |
| R.B. Beal | David Frost |
| Rory Bond | Scott Glubay |
| Vadim Bondar | Stryder Hartley |
| Christopher Borges | Joseph Hartsough |
| Charlene Branham | Andrea Hatch |
| Roger Burt | Nathaniel Hood |
| Adam Byerley | Nicholas Jones |
| Nathan Chennette | Tom Keffer |
| Stefanie Christopherson | Roger Kennedy |
| Jason Coulter | Michael Larson |
| Travis Crone | Jonah Lucht |
| Jose de la Mora | Christian Lyness |
| Jonathan McCormick | John Rowe |
| April Michael | Jake Rozsa |
| Nick Miller | Ron Schaefer |
| Gabriel Miranda | Owen Shaw |
| Alfonso Miranda | George Simmons |
| Michael Monzo | Michael Smith |
| James Payne | Levi Stoddard |
| Robert Pelcher | Jeremy Vogel |
| Sean Priest | Nicole Wood |
| Kyle Robb | |

COMPLAINT - 22